No. 7.—THE BANK OF ST. MARYS, plaintiff in error, *vs.* MUMFORD & TYSON, defendants.

[1.] Where notice to sue the principal maker of a note, by the security, under the provisions of the Act of 1831, was directed to the Cashier of the Bank of St. Marys, the holder of the note: *Held,* that it was sufficient notice to the Bank, especially as it appeared the Bank *acted* upon such notice.

[2.] Process taken out more than twenty days before the next ensuing term of the Court, to which it is made returnable, and not returned to such next ensuing term of the Court, but is altered, and made returnable to another term of the Court, to be held after the one to which it was first made returnable, is void, under the provisions of the Judiciary Act of 1799.

[3.] Where a chartered Bank is the *holder* of a promissory note, it is embraced within the provisions of the Act of 1831, authorising the security or indorser to notify the *holder* of such note, to sue the principal maker within three months.

[4.] Parol evidence is admissible in a suit by the plaintiff against the defendants, as joint and several promisors of a note, to show that one was security only, to the paper, such fact not being apparent on the face of the note itself.

By NISBET, J. dissenting.

[5.] Where a note is made by A & B, and they say, *I promise to pay* to the order of B, it is a joint and several note. Suit being brought upon this note, by the holder, against B, as maker: *Held*, that B is an original promisor, and that evidence, by parol, offered to prove that B signed the note as surety to A, and thereby, to let him into the benefit of the 2d sect. of the Act of 1826, authorising sureties to give notice to holders of notes, and other instruments, to proceed to collect, &c. is inadmissible.

Assumpsit, in Wayne Superior Court, and motion for a new trial. Argued before Judge FLEMING, at Chambers.

Suit was instituted by the plaintiff, against the defendants, on a note, of which the following is a copy:

$1953$\frac{04}{100}$          MONTICELLO, 10th May, 1838.

Ninety days after date, I promise to pay to the order of Mumford & Tyson, at the Bank of St. Marys, one thousand nine hundred and fifty-three dollars and four cents, for value received, in renewal of note, for $1914.

(Signed,)          THOMAS BUTLER KING.
                    MUMFORD & TYSON.

Indorsed, "MUMFORD & TYSON."

The defendants pleaded general issue, and a special plea that they were securities only, and had given notice to the holder, to sue the principal, under the Acts of 1826 and 1831, and that the plaintiff had granted the principal unreasonable indulgence, until he became insolvent.

The defendant introduced the evidence of A. J. Bessant, the Cashier of the Bank, who swore, that on the 19th Sept. 1840, he received a letter from Messrs. Mumford & Tyson, of which the following is an extract:

" We wish you at once to proceed to the collection of our note against Mr. Thos. Butler King; as we will not hold ourselves responsible for our indorsement, unless suit shall have been instituted in the time prescribed by law. This notice we should have

given you twelve months ago, but did not know that it was ne-cessary."

That in consequence of this notice, on the 24th Sept. 1840, he notified Mr. King of the fact, adding, " I am directed to say, if it is inconvenient for you to pay it at this time, with another indor-ser, our Bank will renew for 90 days."

That, about 29th Oct. 1840, he commenced suit against Mr. King, in Glynn Superior Court, in time for the November term thereof, and forwarded the papers to the Clerk of said County, to be placed in the hands of the Sheriff, for service, which he was informed the Sheriff failed to do. The papers were afterwards returned to him, when he altered them, and made them returna-ble to the Spring term of the Court.

The defendant also introduced an exemplification of the pro-ceedings in the suit of *The Bank vs. T. B. King*, by which it ap-peared, that suit was commenced to the April Term, 1841. The process was dated 29th Oct. 1840.

The plaintiff introduced the original papers, showing that the process was originally returnable to the Nov. Term, 1840, and was changed to April Term, 1841.

The defendant also introduced the depositions of Edmund At-kinson, who swore, " I have some knowledge of said promissory note ; to the best of my knowledge and belief, the practice of the Bank was to require notes to be signed by indorsers, on the in-side, under the name of the drawer, as well as on the back, as I have uniformly done in my own case, in indorsing notes to the said Bank ; and with regard to the note in dispute, in the present case, I know that the indorsers, Mumford & Tyson, signed as indorsers on the inside, under the drawer, because I informed them that the practice of the Bank required that it should be so signed ; and I know that said Mumford & Tyson signed simply as indorsers. I was a Director in the said Bank, but for what length of time I do not recollect. So far as I know, said Bank never did regard said notes in any other light than indorsed ; and I was in one instance served with notice of protest of one of said notes, as indorser."

Several letters were also in evidence, from the Cashier to Mr. T. Butler King, and also to Mumford & Tyson—in all of which the note is spoken of as the note of Mr. King, *indorsed* by Mum-ford & Tyson.

The Bank of St. Marys *vs.* Mumford & Tyson.

It was in evidence that the money, upon the negotiation of said note, was paid to Mumford & Tyson.

The Jury found for the plaintiff, and an appeal being entered, a verdict was rendered for the defendant. A motion was made for a new trial, which was granted by Hon. Charles S. Henry; and on the 19th Nov. 1847, a verdict was taken, by consent, for the defendant, without prejudice or benefit to either party, and an order entered on the minutes, allowing plaintiff's counsel to move for a new trial, before His Honor, Judge Fleming, at Chambers.

Under which order, a motion was made for a new trial, upon the following grounds :

1st. Because the defendants are joint and several makers of the note sued upon, and cannot be regarded as securities, under the evidence; and therefore, do not come within the provisions of the Acts of the Legislature, passed on 26th Dec. 1826, and the Amendatory Act, passed 26th Dec. 1831, defining the liability of indorsers.

2nd. Because the Court erred in admitting any testimony to explain the character of the note, or the obligations of the parties thereto.

3d. Because, if the defendants are regarded as indorsers or securities, they are not entitled to the benefit of said Acts, as they have failed to give the necessary and proper notice to the plaintiff.

4th. Because, if any notice was given, the plaintiff did comply with the requirements of said Acts, as proved by defendant's own witness.

5th. Because the Court erred in permitting testimony to be introduced by defendants, contradicting their own witness.

6th. That the defendants are not entitled to the benefit of the Acts of the Legislature, mentioned in the first ground.

The Court overruled the motion on all the grounds, and this decision is alleged to be erroneous.

S. COHEN, for plaintiff in error, urged—

1st. That the defendants are joint and several makers of the note sued upon, and cannot be regarded as securities, under the evidence, and therefore do not come within the provisions of the

The Bank of St. Marys *vs.* Mumford & Tyson.

Act of the Legislature, passed 26th December, 1826, and the amendatory Act, passed 26th Dec. 1831, defining the liabilities of indorsers. *Chitty on Bills*, 433. *Hunt vs. Adams*, 5 *Mass.* 358. *Hemmingway vs. Stone,* 7 *Mass.* 58. *Story on Prom. Notes, sec.* 57, 58. *Prince*, 461, 462, 470, 471.

2d. That the Court erred in admitting any testimony, to explain the character of the note, or the obligations of the parties thereto. *Bank of the U. S. vs. Dunn*, 6 *Peters*, 51, 59. *Collins vs. Everett*, 4 *Ga. Rep.* 266. *Stubbs vs. Goodall*, 4 *Ga.Rep.* 106.

3d. That if defendants are regarded as indorsers or securities, they are not entitled to the benefit of said Acts, as they failed to give the necessary and proper notice to the plaintiff. *Prince*, 473.

4th. That if any notice was given, plaintiff did comply with the requirements of said Acts, as proved by defendant's own witness. *Peake's Ev.* 259. *Gould's Pl.* 173, *note* 1. *Burdick vs. Green*, 18 *John.* 14, 20. *Hogan vs. Cuyler*, 8 *Cowen*, 203, 205. *Hotchkiss*, 547, 548. *Bunker vs. Shed*, 8 *Metcalf*, 150. *Gardner vs. Webber*, 17 *Pick.* 407, 412.

5th. That the Court erred in permitting testimony to be introduced by defendant, contradicting their own witness.

6th. That defendants are not entitled to the benefit of the Acts mentioned in the first point. *Prince*, 461, 462, 470, 471.

Levi S. DeLyon and Wm. Law, for defendants in error, contended—

1st. Parol evidence was admissible, to show that the defendants, though joint makers, were in fact sureties.

The English authorities are conflicting, but the weight is with this position. 5 *Taunt.* 192. 10 *B. & C.* 578. . 1 *Wheat. Selw.* 326. 8 *Taunt.* 737. *Holt*, 84. 1 *Mood. & Rob.* 58.

2d. In America, the weight of authority is with this position.

Cited and commented on—1 *Gall.* 33. 7 *John.* 337. 1 *McC. Ch.* 461. 3 *Ohio*, 33. 4 *N. H.* 221. 5 *Ala.* 451. 10 *Peters*, 257.

3d. The Statute authorizes the Court to exercise a kind of equitable jurisdiction in these cases. *Prince*, 447.

As to the notice, they contended—

1st. Notice to the agent, is notice to the principal. Cited, 1 *Peters*, 309. *Ang. and Ames on Corp.* 176.

2d. The Cashier is the proper officer to be notified. Cited, 3 *Mason*, 506. 3 *Wheat.* 360, '1. 12 *Sergt. & Rawle*, 265.

3d. The Bank had actual notice. The process was null and void. *Prince*, 420. 2 *Wilson*, 382, '3, '6. 1 *Wend.* 210. 5 *Ib.* 276. 9 *Ib.* 338. 10 *Ib.* 420. 13 *Ib.* 46, 404. 1 *Conn.* 44. 8 *Mass.* 79. 10 *Mass.* 353.

A Bank is embraced within the provisions of the Act. Cited, *Cowper*, 79. 15 *John.* 382. 1 *Cow.* 513. 1 *Wash.* 364. *Ang. and Ames on Corp.* 142, 147, 257. 2 *Inst.* 697, 703. 6 *Howard*, 258.

*By the Court.*—WARNER, J. delivering the opinion.

On the argument of this cause, the counsel for the plaintiff in error, insisted on the following grounds of error, to the decision of the Court below :

1st. Because the Court erred in allowing the defendants to show, by parol evidence, that they were *securities only*, to the note, there being no evidence on the face of the note that they subscribed their names thereto, as *securities.*

2d. Because the Court erred in deciding that the notice to the plaintiff, to institute suit on the note, was sufficient.

3d. Because the Court erred in deciding that suit was not commenced within three months from the time of the notice.

4th. Because the Court erred in deciding that a Bank comes within the provisions of the Act of 26th Dec. 1826, and the amendatory Act of Dec. 1831.

The other assignments of error, made in the record, are substantially embraced within the foregoing exceptions. We will first consider the second, third and fourth exceptions, made to the judgment of the Court below.

[1.] Was the notice to the plaintiff, to institute suit against King, the alleged principal, sufficient? The objection is, that it was directed to the Cashier of the Bank, and not to its President. We take it to be well established, both in Law and Equity, that notice to an agent, in relation to the business for which he is employed, is notice to the principal. The same rule applies equally to a corporation, as to a natural person. *Lawrence vs. Tucker*, 7 *Green.* 195. *Bank vs. Whitehead*, 10 *Watts*, 397. The Cashier of a Bank is held out to the world as its general agent, for the management of its notes, and other securities. But in this case, it appears from the record the Bank *acted* upon the notice ad-

dressed to the Cashier.  The notice bears date 19th Sept. 1840.
On the 24th Sept. 1840, the Cashier of the Bank of St. Marys
addressed the following letter to Thos. B. King, the drawer of the
note : " Dear Sir—I beg herewith to annex an extract from the
letter of Mumford & Tyson, dated the 19th inst. in reference to
your note, indorsed by them, and discounted at this Bank, by
which you will perceive they require the Bank to place it in suit
immediately.  I am *directed to say*, if it is inconvenient for you to
pay it at this time, with another indorser, our Bank will renew for
ninety days."   D. L. Clinch testifies—" While President of the
Bank, he recollects a conversation had between the Cashier and
himself, relative to a communication received from Messrs. Mum-
ford & Tyson, *desiring the Bank to proceed against Mr. King*."
The record not only shows notice to the *agent* of the Bank, but
that it was brought to the knowledge of the President, and acted
on by the Bank, which was, in our judgment, altogether sufficient
evidence of notice to the plaintiff.            •

[2.]  Was the suit against King commenced within three months
from the date of the notice ?   The writ and process was made out
by the plaintiff's attorney, and dated 29th October, 1840, return-
able to the then next November Term of Glynn Superior Court,
which, by law, was held on the 30th day of November, 1840.  The
process was dated more than twenty days before the next Term of
the Court, to which it was made returnable, but did not reach the
Clerk of the Court in time to be placed in the hands of the Sher-
iff, to be served and returned to the November Term.   There is
*no evidence* that the writ and process was ever in the hands of the
Clerk of the Court, before the sitting of the Court in November.
The writ was afterwards returned to the plaintiff's attorney, who
altered the process, and made it returnable to the next April Term
of the Court, without altering the date of the process.   The Judi-
ciary Act of 1799, declares that the *Clerk shall annex a process* to
the petition of the plaintiff, which shall be signed by such Clerk.
*Prince*, 420.   We understand that it is the practice, in the Eas-
tern Circuit, for the Clerk to sign his name in blank, and for the
plaintiff's attorney to make out and date the process, which will
explain the alteration made by the plaintiff's attorney in this case,
without its ever having been filed in the Clerk's office.   The writ
and process, in this case, was made out and dated by the plaintiff's
attorney, more than twenty days before the term of the Court to

which it was made returnable, but was not filed in the Clerk's Office in time for that Court. The process was then altered by the plaintiff's attorney, and made returnable to the next April Term of Glynn Superior Court; and the question is, whether this can be considered as the commencement of a suit, as provided by the Judiciary Act of 1799. That Act contemplates, that all process sued ou' twenty days before the sitting of the next term of the Court, slall be returnable to the first term of the Court thereafter. Thr Act provides that, " If any original civil process shall be taken out, *within* twenty days of the next Court, the same shall be rade returnable to the next Court, to be held after the expiratyn of the said twenty days, and *not otherwise.* And all proces issued, and returned in any other manner, than that hereinbefre directed shall be, and the same is hereby declared to be *nullnd void."* *Prince*, 421. This process was not taken out *witin* twenty days of the next Superior Court of Glynn County, wich was held on the 30th day of November, 1840, but was ta-en out more than twenty days *before* that term of the Court; nd consequently, could not have been made returnable to the next April Term of the Court; and being taken out and returned, in a manner not authorized by the Statute, it is, in the imperative language of the Act, null and void.

[3.] Is a chartered Bank embraced within the provisions of the Act of 1826, and the amendatory Act of 1831? The terms of the Act, in our judgment, are sufficiently broad to embrace *artificial* as well as *natural* persons. The Act of 1831 declares, " That in every case which may hereafter arise, where the security or indorser of any promissory note, or other instrument, after the same has or shall become due, has required or shall hereafter require the *holder* thereof, to proceed to collect the same, and the said *holder* has not proceeded or shall not proceed to do so, within three months after such notice or requisition, the indorser or security shall be no longer liable." *Prince*, 471. The Bank of St. Marys being the *holder* of the paper, is necessarily embraced within the terms of the Act. Upon all the foregoing exceptions, our judgment is unanimous, in affirming the judgment of the Court below.

[4.] In regard to the admissibility of the parol evidence, at the trial, to show that the defendants were *securities* only, to the note, we are not unanimous in our opinions; consequently, I shall

proceed to give my individual reasons, for affirming the judgment below, upon that ground of error assigned in the record.

It is insisted, for the plaintiff in error, that this case comes within the principle of the cases of *Stubbs vs. Goodall*, and *Collins vs. Everett*, 4 *Ga. R.* 106, 266. The rejection of the parol evidence, in both those cases, was based upon the general doctrine of the Law Merchant, wholly independent of our State legislation. But in the view which I take of the questions settled, in the cases of *Stubbs vs. Goodall* and *Collins vs. Everett*, with regard to the admissibility of parol evidence, upon the general principles of the Law Merchant, they do not stand in my way in this case.

The parol evidence offered in *Stubbs vs. Goodall*, was for the purpose of showing that a note, not payable on its face to a chartered Bank, was *intended* by the contracting parties, to be negotiated at a chartered Bank, and thereby discharge the defendant as indorser, for want of demand and notice. The evidence offered, went to change the legal character of the contract, and the legal liability of the defendant under it, in its inception—to change his *absolute* liability on the face of the paper, into a *conditional* one. In *Collins vs. Everett*, we ruled, that according to the Law Merchant, Collins was liable, on the paper, as second indorser, and that parol evidence was inadmissible, to alter or change his legal liability under the contract, as it appeared on the face of the paper. In that case, we said—" The legal import of this instrument, is to make Collins a second indorser, with secondary liability, according to the Common Law, upon presentment for payment and notice, and with the right of going upon a previous indorser, if any, in the event of his having the note to pay. The effect of the parol testimony, is to change altogether this *import*, and to make Collins primarily liable, as an original promisor—to substitute a *new contract*, in short. The writing is the evidence of the contract. If that is plain—if from that the meaning of the parties is fairly deducible, it must stand; the law will not make for them a new contract." In both cases, the parol evidence was rejected, because it went to alter and change the *original character* and *legal obligation* of the contract; in other words, to *substitute a new contract*. Does the parol evidence offered in this case, to show the defendants were *securities*, alter or change the *original character of the contract*, or the obligations of the parties to it? By the terms of the contract, as it appears on the face of the pa-

per, the defendants are joint and several promisors to the plaintiff. When it is established by the evidence that the defendants are securities, are they not still joint and several promisors with the principal maker, and in all respects liable to the plaintiff as such? Being *securities* for the principal maker, does not, in any manner, alter or change their *legal liability or obligation to the plaintiff, on the original contract, as joint promisors with the principal maker.* The parol evidence offered, does not substitute any *new contract* for the written one, nor alter or change the *legal liabilities* of the contracting parties thereto. The parties are still bound by the contract, as they *originally contracted to be bound*, and hence, in my judgment, this case is clearly distinguishable from the cases of *Stubbs vs. Goodall* and *Collins vs. Everett.* In Alabama and New Hampshire, it is held that a maker of a note, who signs as *security*, although such fact does not appear on the face of the paper, may show, by *extrinsic* evidence, that he is security. *Grafton Bank vs. Kent*, 4 *N. H. R.* 221. *Pollard vs. Stanton*, 5 *Ala. R.* 451. But suppose I am mistaken with regard to the admissibility of the parol evidence, to show that a defendant is security to a note, upon the general principles of the Law Merchant, as ruled in *Stubbs vs. Goodall*, and *Collins vs. Everett*, yet, when I take into consideration our own legislative enactments, on the subject of securities, I can entertain no doubt that the evidence is admissible. The Act of 20th December, 1826, was enacted for the purpose of *protecting* the securities on bond, note or other contract. The 4th section of the Act provides—
" When any person or persons hath heretofore, or shall hereafter, become bail on recognizance, or security on bond, note or other contract, and shall be sued thereon, it shall and may be lawful for such bail or security, on the trial of such case, to make *special defence ;* and in case it should appear to the Court, that one or more of the defendants is or are securities only, and not interested in the consideration of the contract sued on, then, and in such case, verdict and judgment shall be entered accordingly, and further proceedings had, and privileges exercised, as hereinbefore prescribed, in behalf of the other securities ; provided, the plaintiff shall not be delayed, by any dispute which may arise between the defendants," &c. The 6th section of the Act provides, that when any security to any note, bond or obligation, shall subscribe himself as *security* thereto, it shall be good evidence of his being

such, and the plaintiff shall sue out process against him, accord-
ingly. *Prince*, 461. During the same session of the Legisla-
ture, another Act was passed, for the *protection* of securities,
which was amended by the Act of 1831, requiring the holder of
the note to collect the same, within three months after notice. to
that effect, by the security. *Prince*, 462. But it is said, that the
Act of 20th December, 1826, only authorized the security to
make special defence, and show he was security, so as to enable
him to control the judgment against his principal. Whether the
Legislature intended to *limit* the introduction of the parol evi-
dence to that *special* object, I will not pretend to say. It is suffi-
cient for my purpose, that it is an *express declaration of the legisla-
tive will*, in favor of the admission of *parol testimony*, to show that
a defendant is *security* only, when sued upon a note or other con-
tract. The *admissibility of the parol evidence* is the question—not
the *objects* to be accomplished by its admission. The object of
the Act of 20th December, 1826, as well as the Act of 26th De-
cember, 1826, and the amendatory Act of 1831, was for the ben-
efit and *protection* of securities. Take all the Acts together, and
construe them as one Act, for the purpose of giving effect to the
declared intention of the Legislature, and can it be doubted that
when a security is sued upon a promissory note, and desires to
avail himself of the protection afforded by the Act of 26th Decem-
ber, 1826, and the amendatory Act of 1831, against the laches or
negligence of the holder, he could make *special defence,* and show
by parol evidence, that he was *security*, so as to enable him to re-
ceive the benefit and protection,. as such security, which the Acts
of the General Assembly secure to him ? I cannot for a moment
believe that the Legislature intended that a security who had re-
quired the holder of the note to proceed to collect it out of the
principal maker, but who had failed to do so, until after three
months had expired, should be driven into a Court of Equity, to
obtain the *protection* given him by the Statute. When the Act of
26th December, 1826, and the amendatory Act of 1831 were
passed, requiring suit to be instituted within three months from
the date of the requisition by the security, the Legislature must
have been aware of the provision made in the Act of 20th De-
cember, 1826, allowing the security to make *special defence*, and
to show upon the trial, he was *security only* to the contract. The
object of the Legislature was not exclusively to protect the secu-

rity against his principal, but to protect him also against the *laches* of the holder of the note ; and by construing all the Acts together, as one Act, for the relief and *protection* of securities, I am clearly of opinion, the parol evidence was admissible, to show the defendants were securities, they having specially pleaded that fact in their answer.   In addition to the Acts already cited, we have another Statute, passed in 1831, which authorizes the securities, even when they have failed to make special defence at the trial, as provided by the Act of 20th December, 1826, and judgment has been rendered against them as *principals*, to show by parol, that they were securities only, to the original contract, so as to enable them to control the judgment against their principal.  *Prince,* 470.   We are told, however, that when the defendants signed the note, their names appeared on the face of it as *principals*, and that the effect of the parol evidence, is to defeat the plaintiff's right to recover, inasmuch as it lays the foundation to make the defendant's notice to sue available.   It is true, the evidence that the defendants were securities to the note, in connection with other facts proved at the trial, does destroy the plaintiff's *remedy* to recover on it, as against them.   The plaintiff who contracted with the defendants, *knew* they were securities, and he must be presumed to know, that if he did not sue the principal maker, within three months after notice to do so, by the securities, they would be discharged.   Both parties must be presumed to have entered into the contract, with reference to the law governing it.   The defence set up by the defendants, does not, in any manner, affect the *construction,* or *original obligation* of the contract; it only affects the plaintiff's *remedy* to enforce that contract.   The plaintiff has lost his remedy on the contract, by his own negligence. He has omitted to do what the law required him to do, when notified to sue the principal maker of the note, and which duty the law obliged him to perform, to secure his remedy, when the contract was made.   The law declared to him, when the defendants signed the notes, (he knowing they were securities,) that when the note became due, they had the right to notify him to sue the principal maker ; and if he omitted to do so within three months, his remedy against them would be gone.   The contract itself, is not in any degree, impaired by the parol evidence, as I have before endeavored to establish ; and the plaintiff's *remedy* against the defendants, as securities, was perfect, until the expiration of the

three months after the notice, when, by his own laches, he lost it, as he knew he would do under the law, when he made the contract; as much so as if he had lost his remedy by the Statute of Limitations, in not suing within six years from the time the note became due. The evidence, then, does not impair or defeat any of the plaintiff's rights, as growing out of the contract itself; but it establishes a fact which was well known to the plaintiff, at the time the contract was made, and which, taken in connection with the other fact, that he neglected to sue within the time prescribed by law, after notice to do so, defeats his *remedy* against the defendants. It is conceded that the parol evidence would be admissible in a Court of Equity, if the defendants were seeking relief in that Court. But why compel securities to go into that Court, when the same relief can be had in a Court of Law, the more especially as the Legislature have taken some pains to provide for the *relief* and *protection* of securities, in our Common Law Courts?

In *Beall vs. The Ex'rs of Fox*, (4 *Ga. R.* 404,) we held that the Superior Courts in this State, are empowered to exercise general Equity jurisdiction, in *all cases* where a *Common Law remedy is not adequate*, and that the Equity jurisdiction was not limited to certain specified objects, as insisted on in that case. The General Assembly, in the year 1820, after reciting the 53d section of the Judiciary Act of 1799, which declares that the Superior Courts, in the several Counties, shall exercise the powers of a Court of Equity in *all cases where a Common Law remedy is not adequate*, &c. enacted, "That from and after the passing of this Act, whenever any of the cases *enumerated* in the before recited section, a plaintiff or complainant shall conceive that he, she or they can establish his, her or their claim, without resorting to the *conscience* of the defendant, it shall, and may be lawful for every such plaintiff or complainant to institute his, her or their action upon the Common Law side of the Court, and shall not be held to proceed, with the *forms of Equity*, any law or usage to the contrary, notwithstanding." *Prince*, 447. If the remedy, for the protection of the defendants, as securities, was *not adequate* in the Common Law Court, then, their case is embraced by the Act of 1820, provided they were plaintiffs or complainants; for *cases in which a Common Law remedy is not adequate*, are enumerated in the 53d section of the Judiciary Act of 1799. There are doubtless many cases which may be presented, in which a Common

The Bank of St. Marys *vs.* Mumford & Tyson.

Law Court could not afford an adequate remedy—as where *terms* are to be imposed on the parties, by the *special decree* of the Court. There is not, however, any such difficulty in this case; a Court of Law is as competent to afford relief and *protection* to the securities, as a Court of Equity, and the only reason urged for compelling the defendants to resort to a Court of Equity, is to enable them to obtain the *parol evidence* that they were *securities only*. I have cited the Act of 1820, for the purpose of strengthening the evidence, which I think is *indelibly stamped* on the face of our legislative enactments, that securities on bonds, notes or other contracts, may have the relief and *protection* expressly given to them by Statute, in the Common Law Court, in as full and ample manner as they could in a Court of Equity, and that it is not necessary for them to resort to the latter Court, to enable them to show, by *parol evidence*, that they were *securities*. The whole drift and policy of our State legislation, looks the other way, and I will add, the reason of it too. Let the judgment of the Court below be affirmed.

LUMPKIN, J. concurring.

As there is no labor I perform so grudgingly, as writing out a dissenting opinion, I shall be as brief as a sense of duty will permit, restricting myself entirely to the single point respecting which the Court disagree.

The Bank of St. Marys brought an action of assumpsit in the Superior Court of Wayne County, against Mumford & Tyson, on the following note : " Ninety days after date, I promise to pay to the order of Mumford & Tyson, at the Bank of St. Marys, one thousand nine hundred and fourteen dollars and four cents, value received, in renewal of note for $1,914.

Signed,     THOS. BUTLER KING.

        MUMFORD & TYSON.

The defendants pleaded the general issue, and specially, that they had given notice to plaintiffs, to proceed against King, the principal ; that they failed to do so in terms of the Statute ; and on the contrary, had granted an unreasonable indulgence to the maker of the note, until he became insolvent ; that they signed the note as securities only, &c.

[4.] The question is, can the defendants, in a Court of Law,

prove by parol testimony, that although joint makers, in point of fact they were sureties only ?

It occurs to me, that there is a preliminary point to be settled first, and that upon the decision of that, this question turns—viz : whether the defendants, admitting that they are sureties only, come within the provisions of the Act of the Legislature, passed 26th December, 1826, and the amendatory Act of 26th December, 1831, defining the liability of indorsers and securities to promissory notes, and other instruments ? The first of these Acts declares, that " *Any* security or indorser, may, whenever he thinks proper, after the note or instrument becomes due, require the holder to proceed to collect the same ; and if he should fail to do so within three months, the indorser or security shall be no longer liable." *Prince*, 462. The other provides, " That in *every* case which may hereafter arise, where the security or indorser of *any* promissory note, or other instrument, after the same has or shall become due, has required, or shall hereafter require, the holder thereof to proceed to collect the same, and the said holder has not proceeded, or shall not proceed to do so, within three months after such notice or requisition, the indorser or security shall be no longer liable.' *Prince*, 471.

I ask, what *securities* are embraced in these remedial Statutes ? Is it *all* who are so *in fact*, or only such as appear to be securities, from *the form* of the contract ? If the former, then the testimony was admissible. If the latter, it should have been excluded. But can it be supposed for a moment, that the Legislature intended to limit the provisions of these most salutary enactments, in behalf of a highly favored class of persons, to those *only* who, from the *form* of the contract, *the law* made securities ? Such a construction would be to emasculate these Acts of three-fourths or more, of their efficacy. Besides, it is to disregard the plain and obvious language of the law itself. It declares that *any* security, in *every* case which may arise, shall be entitled to this relief. By what right shall we undertake to circumscribe its beneficent provisions to a particular class or description of securities ?

But to show that no narrow-minded policy of this sort influenced the mind of the Legislature, look to analogous Statutes, passed at the same time, and upon the same subject-matter, to-wit : the protection and relief of indorsers and securities. They declare, that when *any* security to any *note*, bond or obli-

gation, shall subscribe himself as such, such statement appended to his name, shall be held and taken as good evidence of his being security, and the plaintiff shall sue out original and mesne process against him accordingly.  That when it does not appear upon the face of the paper itself, nevertheless, special defence may be made at the trial, to that effect, and the fact established. And further still; that where securities fail to avail themselves of this defence, and judgment has been rendered against them, and they have been compelled to pay off the execution, they may yet get the control of the *fi. fa.* in order to remunerate themselves out of the principal, provided it shall be made satisfactorily to appear, that they were *bona fide* securities only, upon the original contract, which was the foundation of the suit.

Shall it be said that these Acts relate to controversies between securities and principals, and not between securities and holders? I might concede this, and how stands the argument then?  Why, that the Legislature has allowed securities, of every sort, without regard to the form of the contract—*all* who are such *in fact,* whether the evidence of it be upon the face of the paper or not at any time, to establish the true relation they sustain to the contract, with a view to indemnify themselves against the principal; and that parol proof is competent in a proceeding at Law, for this purpose; but as between the security and creditor, or holder of the note, no such relief was contemplated.  It does seem to me, with the most profound respect for the advocates of this doctrine, that the mere statement of it carries its refutation.

But how stands this question, independent of our Statute? Judge *Story* says—" That if a creditor does any act, injurious to the surety, or inconsistent with his rights, or if he omits to do any act, when required by the surety, which his duty enjoins him to do, and the omission proves injurious to the surety—in all such cases, the latter will be discharged, and he may set up such conduct, as a defence to any suit brought against him—*if not at Law, at all events, in Equity."*  *Story's Eq. Jur.* §325.  And in a note to the text, he remarks—" The proposition is thus qualified, because, in a variety of cases, it is certainly very questionable, whether the defence can be asserted at Law, though there is no doubt that it can be asserted in all cases in Equity.  It has, indeed, been said by a learned Court, that there is nothing in the nature of a defence by a surety, to make it peculiarly a subject of

Equity jurisdiction ; and that whatever would exonerate a surety in one Court, ought to exonerate him in the other." Citing, *The People vs. Janssen,* 7 *Johns.* 332.   *S. P.* 2 *Johns. Ch.* 554, 557. " But the doctrine," continues the learned commentator, " does not seem to be universally adopted ; and certainly, it has not been acted upon in England, to the extent which its terms seem to import." Citing, *Theobald on Principal and Surety, p.* 117 *to* 138.

Concede then, that in England the doctrine is doubtful, as to the admissibility of this defence and proof *at Law,* the weight of American authority is decidedly in its favor.

In *Smith vs. Bing,* (3 *Ohio,* 33,) the Court say, " That the true relation of the parties to the paper, *where the obligation itself imports a joint debt,* is universally recognized by Courts of Justice, and parol proof admitted to establish its existence." Indeed, in this case, the principle involved in the point before us, was not denied ; counsel insisted merely, that if the fact of the security-ship did not appear upon the obligation itself, it ought to be brought to the knowledge of the party by some other means, as the creditor is supposed to rely upon the legal liability of the joint undertakers, apparent upon the face and character of the instrument.

In *Smith vs. Truro and another,* (1 *McCord Ch.* 451,) *Johnson, J.* in delivering the opinion of the Court, says—" It is a matter of common notoriety, that contracts of this nature do not usually distinguish between the principal and the surety ; and that it may and must be proved by parol, is a conclusion which necessarily arises out of the numerous cases growing out of them, and by the numerous rules of law which regulate their respective rights. *And I take the principle to be, that the relationship which subsists between the joint obligors, is a matter wholly extrinsic of the written contract, and may therefore be proved by parol, without any violation of the rule which prohibits the introduction of parol evidence, to contradict or vary a written agreement."*

*Grafton Bank vs. Thomas Kent,* (4 *N. H. R.* 221,) was an action of assumpsit, upon the following promissory note : " For value received, we jointly and severally promise the President, Directors and Company of the Grafton Bank, to pay them, or order, five hundred dollars, on demand, with interest, after sixty days.          (Signed,)          AARON HALE.
                                                                  THOMAS KENT." .

The defence set up on the trial was, that Kent signed the note as surety only, and that he had been discharged by day of payment given to the principal, without his consent or knowledge. To the admissibility of the evidence, to support this plea, the plaintiff objected, because it went to contradict the note; the exact case at bar, in every feature. And the whole Court were of the opinion, that where the maker of a note does not appear on the face of the paper, to be a surety, he is to be treated and considered as a principal, with respect to all those who have no notice of his real character; *but that wherever it is material, a defendant may show, by extrinsic evidence, that he made the note as a surety only, and that it was known to the plaintiff that he was only surety.*

Suppose that in England and in the States, where some contrariety of opinion exists, as to this question, there had been, as in Georgia, an express Common Law remedy given, for the relief of securities, against the holders of promissory notes; would it have been doubted for a moment, that the evidence was competent at Law, as well as in Chancery? There they may be driven into Equity, because it is perhaps the only power which can grant relief; but here the Statute itself gives specific and ample redress. And wherever this is the case, there can be no reason why the same rules of evidence, as to written contracts, should not be used in the Courts of Common Law, as in Chancery; for I repeat, that it is for want of proper remedies that parties are driven into Chancery.

And what principle is violated, by showing the true character of one of the makers, with a view to his exoneration? Can you not prove the defendant an infant—a *feme covert*, or a bankrupt, in order to discharge him or her, and that too, while others remain bound? Why not also prove him a security? The evidence does not go to affect the original contract in any respect, and in this particular, is widely distinguished from *Stubbs vs. Goodall,* 4 *Ga. R.* 106, and *Everett vs. Collins, Ib.* 266. At any rate, if this case is irreconcilable with *Goodall and Stubbs* there is some consolation in knowing that the Supreme Court of New Hampshire, one of the ablest judicial tribunals in this or any other country, is in the like transgression. For that opinion, as this, is sustained by authority, directly in point from that State, as will be seen by referring to it.

But suppose this question were *doubtful,* what direction ought to be given to it by a Georgia Court, where it is the manifest de-

sign of the Legislature to break down the wall of separation between Law and Equity, and to suffuse the two jurisdictions? Why were the Superior Courts in this State clothed with Chancery powers? The Act of 1799 sufficiently answers this inquiry. There were cases where a Common Law remedy was not adequate. *Prince, 1st ed.* 218. And it was to meet this mischief that Equity jurisdiction was bestowed. Is it not unreasonable, therefore, to send a security to a worse and more expensive tribunal, to make a Common Law right available?

All power, whether judicial, political or ecclesiastical, is aggressive and accumulative. *Crescit eundo*, is its motto. Courts are not exempt from this master principle of the universe, as their history abundantly demonstrates. The jurisdiction of the Court of King's Bench, was originally confined to pleas of the Crown; but now, all actions are admissible within its walls, through the medium of a legal fiction, adopted for the purpose of enlarging its authority, that every person sued, is in the custody of the Marshal of the Court, and may therefore be proceeded against for any personal cause of action. The Exchequer has adopted a similar course; it was confined, originally, to the trial of revenue cases; it has, however, by means of another fiction, the supposition that every body sued is debtor to the Crown, and further, that he cannot pay his debt, because the other party will not pay him, opened its door to every suitor.

So, too, it has been with Equity. It had its origin in the *rigidity* of the rules and remedies provided by the Common Law. The grant of Chancery jurisdiction, in 1799, to the Superior Courts, by the Legislature, had its origin in the same cause. And what do we hear in 1820? Why, a complaint, by the Legislature, that under the construction of this grant, the Equity side of the Court had drawn to itself, exclusively, all cognizance of the cases in said section enumerated, even where said cases depend upon *aliunde proof*, to the manifest embarrassment of justice in many cases, and to the injury of the good citizens of this State. *Prince,* 447. Parties are thereafter authorized to sue, in all cases, upon the *Common Law* side of the Court, whenever they can establish their claim, without resorting to the conscience of their adversary. And to encourage suitors in this *forum*, it is further provided, that after the commencement of the action at Common Law, the party may, at any time during the progress

of the suit, file a bill for discovery, in aid of the action at Law. And not content with this, by the Act of 1847, (*Pamphlet Laws, p.* 197,) plaintiffs or defendants, in any action at Common Law, may compel discovery, in answer to interrogatories merely.

As for others, let them do whatever a sense of duty to themselves and the country shall dictate. For myself, I shall not be found fighting to the water's edge, to uphold the tottering fabrics of superannuated systems. I believe that the Legislature is only keeping pace with the spirit of improvement, which so signally characterizes the age. Conservatism in law, as in politics, may be carried too far; it may dam up the current of wholesome and necessary reform, until it shall sweep over all barriers and restraints, and desolate, by its sudden and irresistible flood, much that is valuable.

The useful arts must retire before those which are more useful. Old dispensations must give place to those which are new and better. As well may the forest, which answered its day, by refreshing the hunter in the toilsome chase, complain that it is cut down to make room for the corn and the fruit-tree, as that Equity should insist that the suitor should enter her gates alone, for relief, where there is a Common Law right given, and a Common Law Court can do complete justice to the parties.

I concur, fully, in affirming the judgment of the Court below, in admitting the parol testimony, to show that the defendants, although *in form*, joint makers, were in point of fact, securities; and as such, upon proper proof being made, entitled *at Law*, to the relief furnished by the Acts of 1826 and 1831.

NISBET, J. dissenting.

[5.] I concur in the judgment of the Court, upon all the points made in this case, except as to the admissibility of the parol evidence. The defendants pleaded in the Court below, that they signed this note as sureties for *Mr. King*—that under the Act of 1826, they notified the plaintiffs to sue—that they failed to bring suit within three months, and they (defendants) are thereby discharged. The parol evidence was offered to support this plea, and by the presiding Judge, admitted, my associates think, rightfully—I am constrained to believe, wrongfully. I assume that on the face of this note the defendants *are not* sureties, and that parol evidence

cannot be admitted, either upon Common Law principles, or by virtue of our own Statutes, to show that they are, and thus let them in to the benefits of the 2d section of the Act of 26th December, 1826 ; *because* the effect of such testimony would be to add to and vary the written contract between the parties.

I shall not enter at large into the consideration of the vexed question of the admissibility of parol evidence, where there is a written contract, but shall endeavor, briefly, to apply the general rule to the case before me. That general rule is—" Parol evidence is not admissible to add to, vary, or contradict a written instrument." I have had occasion to say before, that the application of the rule to negotiable paper, ought, in my poor judgment, to be more stringent, than to instruments of almost any other character ; for reasons founded in commercial policy. " The liability of parties to a bill of exchange or promissory note, says *Mr. Justice McLean,* in *Bank of the United States vs. Dunn,* has been fixed on certain principles, which are essential to the credit and circulation of such paper. These principles originated in the convenience of commercial transactions, and cannot now be departed from." 6 *Peters,* 58. 4 *Ga. Rep.* 273. It is the interest of every citizen, whether merchant, agriculturist, artisan, or retired capitalist, that the principles of the Law Merchant remain settled. The rule above stated, is founded on the presumption that when the parties to a contract have reduced it to writing, all previous negotiations and contemporaneous propositions are merged in the *writing.* They have with solemnity declared it. The instrument is, with all seriousness, made the *evidence* of what are their respective rights and obligations. They send it out into the commercial world to perform its functions, according to the character which the law, sitting in judgment upon the evidence which *they* have furnished, gives to it; and according to no other evidence. They have agreed that the *writing* shall be proof of their act and intention—that it shall be valid and compulsory on them. They thus notify all who may become interested in it, that they are bound by no stipulations beyond its written terms. The policy of the rule is avouched in those inconveniences, which grow out of the various conceptions which different minds may have of the same subject—of the liability of all persons to forgetfulness—of passion—prejudice and perjury. Unwritten contracts are uncertain ; whereas, *litera scripta manet.*

My first proposition is, that parties to written contracts are to be held as contracting in reference to the general law of the land. Thus, where one makes a promissory note, he is to be held as making it, subject to that kind of liability which the law casts upon makers ; and the payee receives it, vested with all the rights which the law gives to payees.

My second proposition is, that where parties have clearly expressed their meaning in writing, and the law gives to such writing a fixed and determinate character, that is to say, fixes the rights and liabilities of the parties on the face of their own instrument, it is a contract which can in no respect be added to, varied, or contradicted by parol evidence. The exposition which the law gives to the writing, is the contract; and that exposition is the rule and measure of the liabilities and rights of the parties. In all such cases, the holder can have nothing, and the maker be bound to nothing, which, according to settled principles, are not deducible from the written instrument, and the application of these settled principles to the instrument, belongs to the Courts.

I apply these propositions to the note in this case. It is in the following words and figures :

$1953$\frac{04}{100}$                    MONTICELLO, 10th May, 1838.

Ninety days after date, I promise to pay to the order of Mumford & Tyson, at the Bank of St. Marys, one thousand nine hundred and fifty-three dollars and four cents, for value received, in renewal of note, for $1914.

(Signed,)                THOMAS BUTLER KING.
                         MUMFORD & TYSON.

Indorsed, "MUMFORD & TYSON."

The suit was brought by the Bank of St. Marys against Mumford & Tyson, not as indorsers, but as makers of this note. The plaintiff sought to hold them liable, as original, unconditional undertakers to pay—the plea and the evidence by parol, to support it, sought to make them sureties for Mr. King, and by the Act of 1826, conditionally liable—that is to say, not liable at all, if upon notice to do so, the plaintiff failed to sue Mr. King within three months.

Now, what is the legal effect of this paper ? There is nothing peculiar in it—nothing unknown to the Commercial Law. It varies from the usual mode of making notes, in this, that the parties, being more than one, in its body say *I promise* to pay, instead of

*we.* Admitting that this is not according to the usual phraseology, yet it is no anomaly in the law. The law is quite familiar with such notes. The use of the singular *I* instead of the plural *we,* creates no ambiguity. The judgments of the Courts have given a construction to just such a peculiarity—which judgments are as familiar to the profession, and I have a right to presume, to mercantile men, as any other rule of Commercial Law. Nor is it a thing to be thought strange by lawyers or merchants, that this note is payable to the order of one of the makers, Mumford & Tyson. Such things are of every-day occurrence. This is a joint and several negotiable promissory note. *Smith's Mercantile Law,* 216. *Clark vs. Blackstock, Holt,* 474. *March vs. Ward, Peake,* 130. *Lord Galway vs. Mathew,* 1 *Camp.* 403. 10 *East,* 264. *Butler vs. Malissy,* 1 *Stra.* 76. 2 *Stra.* 819. *Cowp.* 832. *Chitty on Bills,* 529. 5 *Mass.* 358. 1 *Hill, N. Y. R.* 256.

It is the several promise of Thomas Butler King to pay; it is also the several promise of Mumford & Tyson to pay. It is farther, the joint promise of Thomas Butler King and Mumford & Tyson, that *they* will pay.

The legal effect of the note is to make Mumford & Tyson original and *unconditional* undertakers to pay to their own order, or to whomsoever might become the legal holder, the sum of money specified in it. Having, by indorsement, ordered its payment to the Bank of St. Marys, they are unconditionally liable to that Bank, as makers. Just as much liable as if Thomas Butler King's name was not on the note. This is the position which they have elected to take—the position which the law assigns them, and to which it will hold them. It can give to them no appellation but that of makers, with just that kind of liability which the Law Merchant, construing this note, fixes upon them. That liability—the liability of the maker of a note—is not contingent or conditional; it is subject to no limitation—it is *immediate* and *direct.*

The meaning of the parties upon the face of the note is clear; it can mean nothing else than that Mumford & Tyson undertook, as makers, to pay the holder so much money. No distortion or torturing of its terms can give to it any other signification. The relation of principal and surety is not suggested, or even shadowed forth in any word or phrase in it; nor can it be implied by the application of any rule or doctrine of the law.

My next proposition is, such being the contract, that evidence

that they were in fact sureties, and thereby giving to them the benefits of the Act of 1826, *varies* that contract. The contract, we have seen, according to the note, is, that they will pay unconditionally, to the holder, the sum of money stipulated to be paid. Let us see what the contract will be, with the addition of the parol evidence. I remark just here, that I do not now consider whether sureties in fact (yet who are not so by the written contract) are embraced in the Act of 1826. I shall look to that hereafter. I am now considering whether, at Common Law, parol evidence is admissible to add to, vary, or contradict this note. To determine this question, it is material to note, that evidence that these parties were in fact sureties, would be, by itself, in the case made, harmless; and that it derives its inadmissible quality from the fact, that by it alone, they are admitted to the benefits of that Act. The Act of 1826 empowers indorsers and sureties to notify holders to sue their principals, and if, being notified, they fail to sue within three months, the sureties are discharged. Conceding, then, that if this evidence is admitted, it would show such a contract as would make the Act of 1826 applicable to it; I say the effect of that evidence is to *vary* the written contract, and is, therefore, inadmissible. What would the contract be, as amended by the parol evidence? It would be to this effect—"We, Mumford & Tyson, are liable to you, the St. Marys Bank, it is true, *as joint and several promisors with Mr. King; yet, inasmuch as we are his sureties, if upon our notice to you to sue him within three months, you fail to bring suit within that time, we are not liable at all"*—a contract of liability, *upon condition*, that being notified so to do, the holder of the note shall within three months sue the principal. Is not this adding new terms to the contract as we find it in writing? Whereas, by the writing, they are unconditionally liable; now, by parol, they are in a certain event, not to be liable at all. Whereas, by the writing, they are not entitled to the privilege of giving the notice and requiring the holder to sue, at the peril of their discharge; now, by parol, they are admitted to the benefits of such a privilege. It does not weaken the principle to say that the discharge is not a necessary result—that it depends upon the diligence of the holder. If the discharge *may* result, it is a variation of the written contract. The advantage to them, although a contingent one, is what they are not entitled to by the written contract.

Again, how does the new contract, as set up by parol, affect the holder? It prescribes to him a law of limitation as to his right of suit against King, the principal, to which, in a Court of Law, he was not subject by the written contract. By the writing, there is no time within which he is bound to sue King. By the parol contract, he is compelled to sue within three months after notice, at the peril of losing all recourse upon the sureties. It is no answer to say, that if he loses his recourse against the sureties, it is the result of his own laches. The contract, by parol, imposes upon him a burden which does not rest upon him by his written contract, for which the sureties did not stipulate, and against which he, in all probability, would have stipulated; indeed, against which, as we shall see, he did in this case stipulate.

The Legislature, I know, may act upon remedies, but it cannot, even through remedies, impair any of the obligations of a contract. And if it be said that setting up this new contract by parol, only affects the holder's *remedy* upon his written contract, I reply that it so affects it, as to vary, fundamentally, as I have endeavored to show, the written contract itself. It may be said that the right of the holder to sue all the parties to this note, in case of notice, is perfect up to the expiration of the three months; and, therefore, the evidence does not affect the written contract in its first formation. If at *any time* it affects it, the impression on it goes back to its origin, and goes forward to its final extinction. How does it vary the principle, that plaintiff's disability, and defendant's additional privilege, is *developed* subsequently to the date of the note? That disability and that privilege is claimed *alone* upon the ground that the contract, *in the beginning*, was what they seek to make it by parol. But there is a very simple view of this matter, which, to my mind, is conclusive. If this evidence does not vary the written contract, why is it tendered? What is there to be proven, but that which does not there appear? If it does not vary it, why not rest upon the writing? No—it is palpable that the defence goes upon the assumption, that the defendant's rights must be adjudicated according—not to the written contract—but the parol contract.

Now, it is true that the authorities touching the admission of parol evidence, in such a case as this, are conflicting. A case sustaining fully the judgment of this Court, was read from 4 *N. H. Reps.* the doctrine of which case, seems to have received some ap-

proval in New York. Other cases were also relied upon in the argument, as directly or indirectly warranting the admission of the evidence. On the contrary, it will be seen that there are cases and Jurists of great authority in our States, denying its admissibility. I think, however, that I may with safety say, that the weight of authority in England denies it. The Common Law is binding upon this Court. The decisions of the States are only so far binding, as they are founded in sound reason and professional learning. Again, I think I may with safety say, that this Court, in several decisions, has adjudicated this very question. That is to say, has clearly settled the principles which control it. The authority of this Court, I shall undertake to show, is against the admission of the evidence. I concede that in a Court of Equity, this defence is available, and that there the evidence may be admitted. Strenuously did the learned counsel insist, that if admissible in a Court of Equity, it ought to be admitted here—urging, that it is unreasonable to drive a party into Chancery, when a Court of Law is competent to give relief. Were I disposed to admit the policy of this view, I would not dare to do what no Judge can do, without usurping the powers of the Legislature—break down the barriers which separate the jurisdiction of the Courts of Law and Equity. I shall await the action of the Legislature.

*Mr. Chitty* lays down the rule applicable to this case, in the following words: "It seems now settled, that *verbal evidence* is not admissible to *contradict* or *vary* an *absolute* engagement to pay money on the face of a bill or note; although, as between the original parties, evidence may be adduced to establish a defence on the ground of a *total want* of consideration, *failure of it* or *illegality*." *Chitty on Bills*, 141.

The invariably conceded rule of the Common Law is here stated. It is, that you cannot contradict or vary an *absolute* engagement to pay money on the face of a bill or note. The exceptions are stated, to wit: want of consideration, total failure and illegality. There are some other exceptions—one for example, mentioned by *Lord Ellenborough* in *Hoare vs. Graham*, 3 *Camp.* 57, to wit: that the note was indorsed to plaintiff as a trust. All the exceptions, however, go to the consideration, the illegality, the delivery of the note, or to frauds between the parties. So run the English decisions. Before adverting to them, I submit whether there is not, upon the face of this note, an absolute engagement to

pay money, and whether any one of the exceptions covers this case. The engagement is absolute, and the defence here is not pretended to rest on any one of the exceptions indicated in the rule. This defence is planted upon an engagement different from, and contemporaneous with, the written absolute engagement to be established by *verbal evidence.* Let us see how similar defences have been repudiated by the ablest men of the British Bench. The case of *Hoare vs. Graham,* decided by *Lord Ellenborough,* is a leading authority. There the defendant's indorsers sought to prove by parol, that the *condition* upon which they indorsed, was that the note at maturity should be renewed.

*Lord Ellenborough* said—" I do not think I can admit evidence of this sort. What is to become of bills of exchange and promissory notes, if they are to be cut down by a secret agreement that they are not to be put in suit. The parol *condition* is quite inconsistent with the written instrument. . . . . . . There may, after the bill is drawn, be a binding promise, for a valuable consideration, to renew it when due, but if the promise is *contemporaneous* with the drawing of the bill, the law will not enforce it. This would be incorporating with a written contract an incongruous *parol condition.*" 3 *Camp.* 57.

In *Free and another vs. Hawkins,* it was proposed to prove by parol, that it was the understanding between the parties, that the defendant, who was sued as indorser, indorsed upon condition, that he should not be liable until after the estates of the maker were sold. The evidence was rejected. *Dallas, J.* said—" One thing is to be observed; if such were meant to be the understanding, it ought to have been expressed on the instrument; but it is not expressed. . . . . . . The effect of the evidence tendered is to vary the note in question, and to control its legal operation; and such evidence I think is inadmissible."

*Park, J.* said—" It has been observed in favor of the plaintiffs, that they sought not, by the evidence tendered at the trial, to *contradict* the note, or *limit* the written contract; but if I issue a promissory note, payable at two months, and enter into a parol agreement that the note shall not be put in suit till the end of five years, or till the uncertain period of the sale of an estate, can it be contended that such a parol agreement does not *contradict* and *limit* the written contract into which I have entered?"

*Burrough, J.* said—" It would be of the most dangerous import,

if evidence of this sort might be let in to cut down written instruments." 8 *Taunton*, 92.

In *Woodbridge vs. Spooner*, the action was brought against the representative of the *maker* of a promissory note. At the trial, the defendant offered to prove that the note, which was on its face payable *on demand*, was agreed, at the time of making it, to be payable *only at the decease of the maker.* The Court rejected the evidence.

*Abbott, C. J.* said—" The object of the testimony was to show that a promissory note, which in terms appeared to be payable on demand, was agreed not to be payable till after the decease of the maker. Now, it is contrary to the rules of law to admit extrinsic evidence to show that the intention of a party executing a written instrument is different from that apparent on the face of the instrument." 3 *Bar. & Ald.* 233.

The object of the defendants in the cause before this Court, was to show that their intention was different from that apparent on the face of the note. The intention apparent on the note is to pay absolutely; the intention to be shown by parol, is to pay as sureties, that is, to pay upon condition.

In *Rawson vs. Walker, Lord Ellenborough,* in an action by the payee against the maker of a note, refused to admit evidence of an agreement between plaintiff and defendant, that the defendant should not be called on until after a final dividend should be made of a bankrupt's estate. 1 *Starkie's Rep.* 301. See also, *Campbell vs. Hodgson,* 1 *Gow. R.* 74. *Bowerbank vs. Monterio,* 4 *Taunt.* 846. *Hogg vs. Smith,* 1 *Taunt.* 347. *Skin.* 54. *Phil. Evid.* 2 edit. 433. *Stark. on Evid. part* 2, 279. *Ridout vs. Briston,* 1 *Tyrw.* 84. 1 *Cro. & J.* 231. *Chitty, Jr.* 1518. *Mosely vs. Hanford,* 10 *B. & C.* 729.

These decisions appear to me to be conclusive as to the rule of the Common Law; and the principle settled by them, seems to be conclusive as to this case. The great principle settled is, that an engagement to pay money absolutely, on note or bill, cannot be superseded, modified or limited by parol evidence. It is proper to say, that the two leading cases of *Hoare vs. Graham* and *Free vs. Hawkins,* are not even so strong as the case I am now reviewing. The actions in those cases were against *indorsers*—here the suit is against *makers ;* and this case is not open to the application of a doctrine which has found its way into a few American books, but

not sanctioned in England, that an indorsement is an inchoate contract, and therefore, subject to explanation by parol.

*Pitman on Principal and Surety*, meets the proposition I am laboring to establish, in the following explicit terms—terms which contemplate the case made upon this record. "In order, however, that the surety may avail himself of a defence *at Law*, it must appear upon the face of the instrument that he is such surety; *for if he is bound as principal, he cannot at Law aver, by pleading, that he is bound as surety*, though in Equity, parol evidence is admissible to show who is principal and who surety. Thus, if two persons are jointly or jointly and severally bound to the creditor, the one as principal and the other as surety, and both appear on the instrument as principals, such surety obligor, when time has been given to the principal debtor, or to the representatives of such principal debtor, may have relief in a Court of Equity, though he could not at Law." *Pitman on Principal and Surety*, 125, 126.

This very direct and unequivocal elementary authority is supported by a series of decisions. In *Rees vs. Benington, Lord Loughborough* declares the rule thus : "Where a man is surety *at Law* for the debt of another, payable at a given day, if the obligee defeats the condition of the bond, he discharges the surety. *When they are bound jointly and severally, the surety cannot aver by pleading, that he is bound as surety*. But *if he could establish that* at Law, the principle at Law is, that he has an interest in the condition, and if the period is extended, that totally defeats the condition, and the consequence is, the surety is released from his engagement." 2 *Vesey, Jr.* 542. His Lordship had previously said, that it was *the form of the* security which forces these cases into Equity. True, if by *the paper*, a party is surety, he has relief at Law ; if by the form of the paper, he is not a surety, although surety in fact, he must go into Equity. That is the doctrine settled by *Lord Loughborough*, and which I am now trying to establish.

The case of paramount control on this question, however, is that of *Fentum vs. Pocock*, tried in 1813, before *Mansfield, C. J. Heath* and *Chambre, Justices.* It is paramount, not only because it meets the question here, but because in it, *Mansfield, C. J.* reviews and overrules the two cases of *Laxton vs. Peat* and *Collott vs. Haigh*, decided by *Lord Ellenborough* at *Nisi Prius*, which are the starting points of the contrary doctrine. In *Kerrison vs. Cook*, (3 *Camp.* 362,) *Gibbs, J.* also expressed strong doubts of the

doctrine ruled in *Laxton vs. Peat.* In *Fentum vs. Pocock,* the question was, whether an acceptor of a bill for accommodation was discharged by an arrangement with the drawer, by the holder, for payment by instalments. The defence was put upon the ground that the acceptance, being for accommodation, the acceptor was surety to the drawer. The defence was rejected, *Mansfield, C. J.* saying, " *He who accepts a bill, whether for value or to serve a friend, makes himself, in all events, liable as acceptor, and nothing can discharge him but payment or release.*" The proof was, that the acceptance was for accommodation. The decision went upon the ground, that on the instrument the acceptor was liable, at all events, as principal. That was the legal import of the written evidence. *Mansfield, C. J.* speaking of the case of *Laxton vs. Peat,* remarks, " When I first saw the case in *Campbell,* I was in the same state with *Mr. Justice Gibbs,* and doubted a great deal whether it could be law.

" The case of *Collott vs. Haigh* must be considered as not a separate decision, but as resting on the authority of the former. It is utterly impossible for any Judge, whatever his learning and ability may be, to decide at once rightly upon any point that comes before him at *Nisi Prius,* and whoever looks through *Campbell's Reports,* will be greatly surprised to see, among such an immense number of questions, many of them of the most important kind, which came before that noble and learned Judge; not that there are mistakes, but that he is, in by far the most of the causes, so wonderfully right, beyond the proportion of any other Judges. But in this case we think we are bound to differ from him, and to hold that it is impossible for us to consider the acceptor of an accommodation bill in the light of a surety for the payment by the drawer," &c. *5 Taunt.* 195, 196. Thus *Laxton vs. Peat* and *Collott vs. Haigh* were overruled.

The case of *Price vs. Edmunds,* in its facts is very analagous to this case. The payee of a joint and several note brought suit against one of the makers, and the defendant proved that he was a mere surety, and that plaintiff had agreed with the principal to indulge by payment in instalments. He claimed, that thereby he was discharged. Counsel for the defendant, whilst relying upon the cases of *Laxton vs. Peat, &c.* was interrupted by *Bayley, J.* with this significant interrogatory: "Does not a party, by signing a note as joint maker, render himself subject to all the liabili-

The Bank of St. Marys *vs.* Mumford & Tyson.

ties of joint maker?" By *Parke, J.* as follows: "Can a contract between the payee and maker of a note be shown by extrinsic evidence, to be different from what it purports to be on the face of the note itself? Here, on the face of the note, the contract purports to be an absolute contract by the defendant for the payment of a sum of money. The effect of the parol evidence was to show that it was conditional." These queries sufficiently indicate the mind of the Court. It did not find it necessary to determine the question, whether the extrinsic evidence was or not admissible, the judgment turning upon another point. However, *Parke, J.* in giving his opinion, said, "As to the other point, I think that the decision in *Fentum vs. Pocock,* where it was held, that the acceptor of an accommodation bill was not discharged by giving time to the drawer, *was good sense and good law."* 10 *Barn. & Cress.* 578.

The next case which I refer to, is that of *Dary vs. Prendergrass.* It was there decided, that in an action on a bond against a surety, it is no defence, that time has been given by parol agreement to the principal. *Abbot, C. J.* said, "The ground of my opinion in this case is that general rule of the Common Law, which requires that the obligation created by an instrument under seal, shall be discharged by force of an instrument of equal validity. The operation of that rule is indeed sometimes such, as to make it imperative upon a Court of Equity to interpose, and grant relief, but it by no means follows that the rule of Law is to be broken down, because a Court, having jurisdiction of another kind, will interpose where there is a particular case, in which the rule of Law will operate harshly. There is a great objection to a Court of Law taking upon itself to act as a Court of Equity, because they have not the means of doing that full and ample justice which the particular case may require. We ought not, therefore, to interpose in a matter which seems peculiarly to belong to the jurisdiction of a Court of Equity. If a parol agreement is entered into to give time to the parties, supposing it not to be the case of a surety, but simply the case of a common bond, conditioned for the payment of money at a certain day, it will not prevent the party from proceeding at Law immediately, whatever the consideration of the delay may be." 5 *Barn. & Ald.* 187.

In *Brittain & Wilson vs. Webb, Bayley, J.* holds the following language: "Besides, the plaintiffs are not at liberty to set up a

parol contract inconsistent with a written contract, and that would be the effect of enabling them to recover on this declaration against the defendant. For it appears by the bill of exchange, which was in writing, that the defendant was entitled to have the contents of the bill paid to him, whereas, the effect of the agreement to be set up, is to show that it never was intended to be paid to him, &c." 1 *Barn. & Cress.* 483. To the same effect is *Lewis vs. Jones,* 4 *B. & C.* 506.

The last case that I shall refer to from the English books, is *Ashbee vs. Pidduck,* in which it is decided, that where three persons entered into a joint bond, and it did not appear, either on the bond or condition, that two of them were sureties for the other, a release given by the obligee to the representatives of one of the deceased obligors, was no answer in behalf of the surviving obligor. *Lord Abinger, C. B.* said, "How does it appear that these defendants are sureties? It does not appear from the condition of the bond that they were so; and you cannot, as against the obligee, show that they were." 1 *Mees. & Wels.* 568.

The American authorities very generally sustain the foregoing rules of the Common Law. I refer to a few of them :

"Where a note is signed, says *Mr. Story,* by two persons, written thus : *We promise,* and signed A B *principal,* and C D *surety,* it is still the joint note of both. And if it were written *I promise,* and signed in the same manner, it would be the joint and several note of both. For the language designating the principal and surety *does not change the rights of the payee or subsequent holder, but merely ascertains the relation of the makers to each other, and operates as notice of that relation to the other parties thereto."* Story on Prom. Notes, sects. 57, 58.

*Mr. Story,* in his Treatise on Bills, speaks more directly to the point, as follows : "So it seems that where several persons are jointly and severally liable upon a contract, the giving of time to one, or proceeding in a suit against one, even to judgment, but without satisfaction, will be no discharge to the other. Indeed it has been thought that it will make no difference in such a case at Law, whatever might be the case in Equity—upon which some doubt may be entertained—that one of the joint parties to a bill is in fact a surety for the other; at all events, if he is not stated to be so on the face of the bill. For under such circumstances, as to the holder, he may and should be treated as a joint principal, with-

out any reference to his relation to the other joint contractor," &c. *Story on Bills*, sects. 430, 432.

The case of *Hunt vs. Adams* decides the principle extracted above from *Judge Story's* text. In that case, the note was signed by A, and C wrote underneath—"I acknowledge myself holden as surety for the payment of the demand of the above note, witness my hand;" signed C. In an action on this note, A and C were held to be joint promisors, and not only joint promisors, but original promisors. Such was ruled to be the legal effect, not only of that note, but also of a note written *I promise to pay*, and signed by A *principal*, and C *surety*. *Parsons, C. J.* said: "The defendant is an original party to the contract as well as *Chaplin*. The contract, in its legal construction, is a promise made, as well by the defendant as *Chaplin*, for value received, to pay fifteen hundred dollars to the plaintiff's intestate. To this promise, *Chaplin* has signed as principal, and defendant as surety. This mode of signing is an accommodation between the promisors, by which the defendant is entitled, if he pay the note, to indemnity from *Chaplin*, but as to the intestate, they must be considered as joint and several promisors. The legal effect of a note in this form is not different from a note in the form of "for value received, I promise," &c. and signed by one with the word *principal* annexed to his name, and by another with the word *surety* thus annexed; or if the form of the note had been, "for value received, I, A B, as principal, and I, C D, as surety, promise to pay," &c. This last form is not uncommon, and the promise has always been holden to be made by each as *original promisor*." 5 *Mass*. 360, 361.

This case determines the *legal effect* of the note upon which the action was brought. Subsequently, the same case in principle, but upon another of the notes between the same parties, came before the Supreme Court of Massachusetts. In the latter case, the defendant, who was the surety on a note described in the reference to the case in 5 *Mass*. offered to prove by parol, an agreement between the principal and the payee, that he, the defendant, was to be holden to pay, only on condition that the principal could not pay. The Court, recognizing the construction as to the legal effect of the note, which had been previously put upon it, and which I have above stated, rejected the evidence, because it was "incompetent to control the legal effect of a written contract."

*Sewell, J.* delivering the judgment of the Court, said, among

other things—" When a contract has been stated in a writing, assented to and signed by the parties concerned, and that continues in being, and under the control of the party relying upon it, evidence of other parol agreements to explain or vary the written contract, would be a rejection of that evidence, which is necessarily the best.

" In the case at bar, if the motion for the defendant should prevail, a conditional and collateral contract might be sustained, by a parol stipulation for a contract in writing, which is absolute, and by which the defendant engages as surety for *Chaplin*. The construction to be given of this note, as written, has been settled by the former decision of this Court, to be the same as if the note had expressed a joint and several promise of *Chaplin* and the defendant. The defendant became responsible to Bennett, immediately and directly, by the legal operation of the written words which he had subscribed." 7 *Mass.* 518, '19, '20.

How nearly in its facts, and how closely in principle, does not this case approach to the one at this bar ? A surety having engaged in writing to pay, absolutely, was not permitted to interfere with the legal effect of his own written contract, by proving a conditional contract.

In the *Bank of the United States vs. Dunn*, an indorser proposed to prove that the payment of the note had been guarantied by the maker, by certain securities, and that the indorsement was matter of form, and therefore he was not liable. The Supreme Court rejected the evidence, because it varied the legal effect of the contract of indorsement. 6 *Peters*, 51. *Also*, 9 *Wheat.* 587. 3 *Dall.* 415.

In *Spring vs. Lovett*, in an action by the payee against the maker, on a promissory note, the defendant was not permitted to prove a parol agreement, that upon his executing a deed of real estate to the plaintiff, the note was to be given up. 11 *Pick.* 417.

So in *Farham vs. Ingham*, evidence that a note, absolute on its face, was payable on condition, was refused. 5 *Ver. R.* 114. See *Low vs. Treadwell*, 3 *Fairf.* 441. 5 *Ver. R.* 152. 1 *Minor Ala. R.* 357. 6 *Mass.* 519. *Palmer vs. Grant*, 4 *Conn. R.* 389. *Rawston vs. Parr*, 3 *Russ. R.* 424. *Baker vs. Briggs*, 8 *Pick.* 122. 19 *Ib.* 260. 24 *Ibid* 64. *Foster vs. Jolly*, 1 *Cromp. Mee. & R.* 703. *Thompson vs. Ketchum*, 8 *Johns. R.* 146. 5 *Porter*, 505.

The majority of the cases which I have referred to, go upon

the ground of a parol *agreement.* It is not pretended in this case, that there was any agreement between the defendants and *The Bank of St. Marys,* that they should be held and bound as sureties ; all that is pretended, is that the Bank had notice at the time of making the note, of the relation between them and Mr. King, of principal and sureties. Thus, at best, amounting only to an equitable defence. So far from *agreeing* to be held bound by the obligations which, through the Act of 1826, might grow out of that relation, it is expressly proven, that it was the usage of the Bank to require indorsers to sign *as makers,* and that the defendants were notified of that usage. The Bank thus stipulated against the very defence set up. The defendants contracted with knowledge of that usage, and are bound by it. The usage was proven to be to require *indorsers* to sign *as makers,* as well as indorsers. The object of this usage, I must infer, was to secure all the legal advantages which such signature would give. For example, the advantage of liability, without demand and notice— primary and original liability, as makers, irrespective of the relation of principal and sureties. As *indorsers,* the Bank knew (such is the legal inference) that they would be entitled to the benefits of the Act of 1826. To shut out those benefits, it required them to become makers on the note. The fact that they were required to sign as makers, rebuts the inference, that it consented to become bound by the legal consequences that might result to it from the relation of principal and sureties.

The rule of the Common Law, as to the admissibility of parol evidence, has been adopted by this Court, and has been applied in more than one case, strikingly analogous to this. It seems to me, that if any one principle has been more firmly settled by this Court than another, it is that for which I am now contending. As early as the first term, held at Cassville, after our organization, this doctrine underwent the review of this Court, in *Rogers vs. Atkinson, et al.*

*Lumpkin,* J. in that case, said—" The burden of the argument of counsel for the defendant in error, has been to establish the rule, that parol evidence cannot be received, to add to, contradict or materially vary a written agreement ; and *that the instrument itself must be considered as containing the true understanding between the parties, and as furnishing better evidence thereof, than any which can be supplied by parol. We subscribe to the doctrine in all*

*its amplitude*—and a series of adjudications in England and in this country, in the State and National Courts, have firmly and uniformly upheld the principle, and placed it beyond the reach of successful attack." 1 *Kelly*, 18. The Judge then proceeds to discuss the rule, and to enumerate exceptions, in its application to different forms of written contracts. No exception which he recognizes, embraces this case.

The case of *Stubbs vs. Goodall*, adjudicates the very principle upon which I insist. That was an action by the indorsee against the indorser of a note, which was *not payable* at a chartered Bank, but simply to the order of the indorser. The defendant offered to prove at the trial, that it was the intention and agreement of the parties, that the note should be negotiated at a chartered Bank. This Court held the evidence inadmissible. The ground upon which the Court went, is developed in the following words of *Lumpkin*, J. who delivered the judgment. Commenting upon an extract from the text of *Mr. Story*, on promissory notes, the Judge says—"We believe it to be a departure from that rule of Law, which precludes the admission of parol evidence, to contradict or substantially vary the *legal import* of a written agreement, than which none is better settled or more salutary in its application to contracts." Again, the Judge quotes from the decision of a case in 3 *N. H. R.* the following proposition, to-wit : " But it seems also to be well settled, that parol evidence cannot be received, to vary or control the settled *legal import* of a *commercial* instrument," (the very doctrine for which I contend,) and gives to it a very emphatic indorsement, in the following words : " We entirely concur in this firm and manly adherence to a rule of Law, which has done more to prevent frauds and perjuries, than the Statute passed professedly for that object. Better, by far, to rest upon broad principles, capable of being comprehended by the humblest capacity, and especially when they have proved so beneficent in their results, than to be forever frittering them away by nice and attenuated distinctions, which elude even the most subtle." 4 *Ga. R.* 106. The case of *Stubbs and Goodall* is distinguishable from the present case, in one particular ; and that particular makes *this* a stronger case than *that*. It is that in *that* case, the defendant was an indorser ; in this, the defendants are *makers*. In *that* case, the admissibility of the evidence, in the argument, was put upon the ground that a blank indorsement is

an inchoate contract, and is therefore susceptible of explanation by parol; which principle, if it were a sound one, has no relevancy to makers. A brief explanation will show that the principles involved in *Stubbs and Goodall*, are the same with those involved in this case. By the Act of 26th Dec. 1826, (*Prince*, 462,) indorsers upon notes and other instruments are not entitled to demand and notice, unless given for the purpose of negotiation, or intended to be negotiated at any chartered Bank, or unless deposited at any chartered Bank for collection. The note in that case, not appearing on its face, to be payable at a chartered Bank, or appearing to have been intended to be negotiated at a chartered Bank, or to have been deposited there for collection, the defendant, Goodall, *was not*, upon the face of the note, entitled to notice. By the legal import of his contract, he was not entitled to notice. His engagement to pay as indorser, was by the law of Georgia, an absolute engagement *without notice*. The payee had stipulated on the note, that he should be liable without notice—he had bound himself, by indorsing a note not payable at Bank, or otherwise appearing to be intended to be negotiated at Bank, to be liable without notice. Now, to let himself into the benefits secured by the proviso of the Act of 1826, that is to say, to place himself in the position of an indorser, entitled to notice by that Act, he offered to prove by parol, that it was the intent and agreement of the parties, that the note should be discounted at Bank. The effect of this evidence was to set up a conditional liability in place of an absolute liability. The legal import of his indorsement was to charge him without notice. By that indorsement his liability did not depend upon notice. By the parol agreement he was to be liable *upon condition* that he had notice. And how did Goodall seek to change his contract? By invoking, through the means of a different contract, to be set up by parol, the *benefits of the proviso of the Act of* 1826 *in his favor*; to make thus, that which was absolute, conditional; to secure thus, a right or privilege denied to him by the legal import of his written contract; to impose thus, upon the holder of the note, a burden which did not rest upon him, by the written contract, towit: the burden of giving notice; to cast upon him a disability, against which, in the note, he had stipulated. Well, in this case, the defendants are seeking to do the same things. By parol, they seek to *invoke the aid of the Act of* 1826 in favor of sureties;

To secure to themselves privileges or rights, to which, by their written contract, they are not entitled; To cast a burden, to-wit: the burden of suing the maker within three months, upon the holder, under which he did not rest, and against which he had stipulated,.both in the written contract, and by the usage of the Bank. In short, to vary the legal import of their written contract, by making what was an absolute engagement to pay money, a conditional engagement to pay money. If there is a difference in the principles of the two cases, I am unable to see it. Upon similar principles, and upon the decision in *Stubbs vs. Goodall*, was determined the case of *Collins vs. Everett*, (4 *Ga. R.* 266,) and a later case, not yet reported, argued at Decatur in August, 1848.

My learned associates, however, place the judgment of this Court, in part, upon the Acts of 1826, in favor of sureties. If I could agree with them, which I cannot do, in their construction of those Acts, still my dissent must needs be made, because they rest their judgment, not upon the Statutes alone, but upon general principles also. What remains to me, is to show, if I can, that this question is in no way dependent upon the Acts, or either of them, of 1826.

There are two Statutes which are claimed to have some relevancy to this case. One passed on the 20th Dec. 1826, and the other on the 26th of Dec. 1826. Both of these Acts relate to sureties. The former is entitled, "An Act to define the liability of securities on appeal, on stay of execution, and for the protection of bail on recognizance, bond, note or other contract." The whole of its enactments have a single, definite and unmistakeable object, and that is to afford to sureties *a summary mode at Law, of remuneration out of their principal.* The rights of the payees of notes, or other holders, are not intended to be affected by it. So far from this being the case, the object of the Act is *expressed*, and that is, in every class of the cases enumerated, to enable *sureties to control judgments against their principals for reimbursement.* By the 5th section of the Act of 20th Dec. 1826, sureties on bonds, notes or other contracts, are authorized on the trial, to make special defence; and in case it shall appear to the Court, that one or more of the defendants are sureties only, and not interested in the consideration of the contract sued on, verdict and judgment shall be entered accordingly; and the surety is clothed

with such privileges as, in a previous section, are conferred upon other sureties.   The privilege referred to is, " the use and control of the execution, for the purpose of proceeding against his principal."   The *defence* in this section given to the surety, is not against the plaintiff in the action, but against the *principal,* who may be sued with the surety.   This is *demonstrated* by the proviso to this section, which is in these words : " Provided the plaintiff shall *in no case be delayed* by any dispute which may arise between the defendants, but the Court shall decide the issues, and the verdict which may have been finally rendered on the issues between the defendants, shall relate back to the time of the verdict and judgment in favor of the plaintiff."   The litigation, the issues made, are between the defendants ; *the plaintiff is not to be delayed.*   His rights remain not only intact, but are expressly protected in this Act.   Then what relation has it, can it have, to a contest between the holder of the note and the maker ?   Surely none, not even the most remote.

The Act of 26th Dec. 1826, has two sections.   The first relates to the liability of indorsers on notes, &c. and is not pretended to have any application to the point in discussion.   The second section is mainly relied upon as controlling it, and is as follows : " Any security or indorser may, whenever he thinks proper, after the note or instrument becomes due, require the holder to proceed to collect the same, and if he shall not proceed to do so within three months, the indorser or surety shall be no longer liable."   *Prince,* 461, 462.   The position is, that inasmuch as this Act authorizes *any* surety to give notice, and upon failure of the holder to proceed to collect within three months, discharges him, that any surety who is so *in fact,* although not a surety on the written contract, may in a Court of Law, plead his suretyship and his notice, and prove it by parol.   Now, I am not prepared to say, that any party to a note, who is *in fact* a surety, is not entitled to the benefit of this Act, whether he appear to be so or not, on the face of the written contract.   What I assert is, that unless it appear on the written contract, that he is a surety, he is not entitled to the benefit of the Act in a *Court of Law.* He may go into Equity and be there relieved, because the rules of proceeding and the law, as settled, governing that jurisdiction, will permit him to have relief there.   He cannot come here for relief, because he cannot get it until the rule of ev-

The Bank of St. Marys *vs*. Mumford & Tyson.

idence, which I hope I have shown is so well established, is abrogated by the Legislature. The Legislature, in granting to him the privilege, without prescribing the manner of his remedy, must be, according to the established rules of statutory construction, considered as remitting him to that forum where the remedy is competent, and not to that where, by existing laws, it is *not competent*. If it is apparent on a written contract, by the signature or by recital, that a party is a surety, then this Act is available to him, in a Court of Law, because there the establishment of his right would not be dependent upon parol evidence, and the exercise of it would not be precluded by any rule of Law. I am not at liberty to *infer*, from the fact that the Legislature has authorized any surety to discharge himself by notice, that it intended to annul, so far as applicable to all instruments to which there might be parties holding to others the relation of sureties, a rule of evidence founded in the clearest reason, and the most manifestly sound policy. If indeed the surety had not a remedy in Equity, I should, in that event, be more inclined to give him one here. I should be disposed to imply a repeal of the rules of evidence which stand in his way, rather than make the Act of the Legislature nugatory. But sitting, as we now sit, in a Court of Law, and construing this Act in the light of Law rules, I must believe that it applies to such sureties on notes and bills, as are so on their face. And as in this case the defendants are not on this note sureties, but unconditional promisors, it does not admit them to the defence set up, or authorize the admission of the evidence.

When I say that these defendants would be entitled to relief in a Court of Equity, I mean to say that there, their defence might be set up and proven ; but I do not mean to say, that in this case, it would be successful ; that would depend upon the case made on the trial. The facts being ascertained, Chancery would no doubt relieve, if the facts would authorize relief. The whole difficulty here is, that the facts which would authorize relief, do not appear upon the contract which the parties have made, and cannot in a Court of Law be ascertained.